# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PENNEAST PIPELINE COMPANY, LLC,<br>One Meridian Boulevard, Suite 2C01<br>Wyomissing, PA  19610<br><br>Plaintiff,<br><br>vs.<br><br>A PERMANENT EASEMENT FOR 1.92 ACRES ± AND TEMPORARY EASEMENT FOR 2.05 ACRES ± IN HOPEWELL TOWNSHIP, MERCER COUNTY, NEW JERSEY, TAX PARCEL NO. 1106-59-13.01;<br><br>COUNTY OF MERCER, JERSEY CENTRAL POWER & LIGHT COMPANY, VERIZON NEW JERSEY, INC. AS SUCCESSOR IN INTEREST TO BELL ATLANTIC OF NEW JERSEY, INC., STATE OF NEW JERSEY, BY THE SECRETARY OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE TOWNSHIP OF HOPEWELL;<br><br>AND ALL UNKNOWN OWNERS,<br><br>Defendants. | CIVIL ACTION<br><br>Docket No. 3:18-cv-1597-BRM-DEA<br><br>**Electronically Filed** |

## BRIEF OF PLAINTIFF PENNEAST PIPELINE COMPANY, LLC IN OPPOSITION TO STATE DEFENDANTS' MOTION FOR STAY PENDING APPEAL

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ............................... 3

    A.    The Extensive FERC Certification Process ........................................ 3

    B.    PennEast Receives the FERC Order ................................................... 5

    C.    Immediate Access to the Rights of Way is Essential ......................... 5

    D.    PennEast's Condemnation Actions ..................................................... 6

ARGUMENT ........................................................................................................... 9

THE PROPOSED STAY IS UNWARRANTED AND WILL
UNNECESSARILY DELAY THE PROJECT. ...................................................... 9

    A.    The State Is Not Entitled to the Extraordinary Remedy of a
          Stay. ..................................................................................................... 9

    B.    The State Fails to Meet the Strict Requirements For a Stay
          Pending Appeal. ................................................................................ 11

          1.    The State Fails to Show Any Likelihood of Success On
               the Merits. ............................................................................... 12

          2.    Denying the Stay Will Not Cause Irreparable Harm to the
               State. ........................................................................................ 15

          3.    Granting a Stay Will Cause Significant Harm to
               PennEast. ................................................................................ 19

          4.    Granting a Stay Would Severely Harm the Public
               Interest. ................................................................................... 20

CONCLUSION ..................................................................................................... 21

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

Akishev v. Kapustin,
  2014 WL 2608388 (D.N.J. May 28, 2014)............................................................9

Anderson v. Davila,
  125 F.3d 148 (3d Cir. 1997) ...............................................................................17

Blatchford v. Native Village of Noatak,
  501 U.S. 775 (1991)...........................................................................1, 12, 13, 15

Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less in
  Penn Tp., York County, Pa.,768 F.3d 300 (3d Cir. 2014)....................................19

Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Dep't of
  Health and Human Servs.,
  2013 WL 1277419 (3d Cir. 2013) ....................................................................9, 10

Douglas v. Ashcroft,
  374 F.3d 230 (3d Cir. 2004) ................................................................................10

HR Staffing Consultants, LLC v. Butts,
  2015 WL 3561618 (D.N.J. June 4, 2015)..........................................................9, 10

Kobren v. A-1 Limousine Inc.,
  2016 WL 6594075 (D.N.J. Nov. 7, 2016) (BRM)..................................................9

Kos Pharms., Inc. v. Andrx Corp.,
  369 F.3d 700 (3d Cir. 2004) ................................................................................10

Landis v. N. Am. Co.,
  299 U.S. 248 (1936)..............................................................................................9

N.L.R.B. v. 710 Long Ridge Road Operating Co. II, LLC,
  2014 WL 1155539 (D.N.J. Mar. 21, 2014) ...........................................................9

Nken v. Holder,
  556 U.S. 418 (2009)............................................................................................10

In re Revel AC, Inc.,
  802 F.3d 558 (3d Cir. 2015) ................................................................................15

Sabine Line v. A Permanent Easement of 4.25 Acres of Land in
  Orange County, Tex.,
  327 F.R.D. 116 (E.D. Tex. 2017) ..............................................................13, 14, 15

Tennessee Gas Pipeline Co. v. 0.018 Acres of Land in the Twp. of
  Vernon, Sussex County, N.J.,
  2010 WL 3883260 (D.N.J. Sept. 28, 2010) ........................................................19

Transcontinental Gas Pipeline Co., LLC v. 2.59 Acres of Land in Pine
  Grove Twp., Schuylkill County, Pa.,
  2017 WL 4005011 (3d Cir. Sept. 12, 2017) ........................................................20

Winter v. Natural Res. Def. Council, Inc.,
  555 U.S. 7 (2008) ................................................................................................15

**Federal Statutes**

28 U.S.C. § 1362 ................................................................................................12, 13

Federal Power Act ................................................................................................15

Natural Gas Act ................................................................................................*passim*

**State Statutes**

N.J.S.A. 4:1C-19 ................................................................................................17

**Rules**

L. Civ. R. 7.1(d)(3) ................................................................................................8

Fed. R. Evid. 201 ................................................................................................19

**Regulations**

N.J.A.C. 7:36–26 ................................................................................................17

N.J.A.C. 7:36–26.1 ................................................................................................17

**Constitutional Provisions**

Eleventh Amendment..................................................................................16

## INTRODUCTION

Plaintiff, PennEast Pipeline Company, LLC ("PennEast") submits this memorandum of law in opposition to Defendant, The State of New Jersey's[1] (the "State") Motion to Stay the Court's December 14, 2019 Order.[2]  Knowing that it cannot meet the standard for a stay, this motion simply is filed to serve the State's goals of (1) attempting to delay the PennEast Pipeline Project (the "Project") and (2) costing PennEast money.  This is clear because the State's sole reason for arguing that the Court made a clear error of law is that the Court overlooked Blatchford v. Native Village of Noatak, 501 U.S. 775 (1991).  But in response to the State's previously denied Motion for Reconsideration, this Court already specifically has stated that it *did not* overlook Blatchford and thus there is zero basis for the State's position.

The State cannot possibly show that it is entitled to a stay, which is an extraordinary remedy, disfavored by courts.  The findings needed to support the State's stay application are the exact same findings that the Court considered when

---

[1] The Motion for Stay is filed in various matters on behalf of The State of New Jersey, New Jersey Department of Environmental Protection ("NJDEP"), State Agriculture Development Committee, Delaware & Raritan Canal Commission, New Jersey Department of the Treasury, New Jersey Department of Transportation, New Jersey Water Supply Authority, and the New Jersey Motor Vehicle Commission.  Collectively, this Brief refers to those Defendants as the "State."

[2] The State also moves to stay the individual forms of Orders entered on January 19, 2019 that applied to specific properties.  For ease of reference, these Orders and the December 14, 2019 Order collectively are referred to as the "Order."

granting PennEast's application for preliminary injunctive relief:  (1) strong likelihood of success on the merits; (2) irreparable injury absent a stay; (3) no substantial harm to other parties if the stay is granted; and (4) issuance of the stay would not harm the public interest.  The State still cannot meet its burden of demonstrating that each of these factors weigh heavily in the State's favor.

After extensive briefing and argument, the Court already has ruled that PennEast, not the State, will succeed on the merits, bears a greater risk of irreparable harm than the State, and that the public interest requires that the Project move forward and not be stayed.  For its second bite at the apple, the State elected to refile its prior brief in support of the Motion to Stay and put PennEast and the Court through another needless step in this already protracted litigation.  Nonetheless, as PennEast previously explained, the State simply disagrees with the Court's denial of its Motion to Dismiss PennEast's claims.  Abundant case law recognizes that mere disagreements with a Court's decision are not sufficient to obtain a stay.

The State fails to cite a single case demonstrating that this Court committed some clear error of law and the State presents no new facts or law which would support the Court reversing its decision.  The State's arguments regarding alleged irreparable harm are equally meritless.  In reality, this motion asks the Court once again to reconsider its December 14, 2018, Opinion and Order granting PennEast the relief it requested and rejecting all of the arguments made by the State.

However, this Court already has rejected the same arguments asserted here by the State multiple times and thus the State cannot credibly argue that it has a likelihood of success on the merits.  Additionally, the State's conduct for the past 30+ years completely undercuts its argument that it will be irreparably harmed absent a stay, as does the fact that this Court's Opinion and Order are limited and apply only to certificate-holders under the Natural Gas Act ("NGA").  Further, this Court (and numerous others including the United States Court of Appeals for the Third Circuit) already have ruled that delay in situations such as this will result in irreparable harm to a pipeline company and the Federal Regulatory Energy Commission (the "FERC") has found this Project to be in the public interest.

In sum, the State's Motion to Stay is just another delay tactic that is needlessly increasing PennEast's litigation expenses and unnecessarily burdening the Court.  Thus, for the reasons listed above and more fully discussed below, PennEast respectfully requests that the Court deny the State's Motion to Stay.

## **STATEMENT OF FACTS AND PROCEDURAL HISTORY**

### **A.    The Extensive FERC Certification Process**

PennEast relies on its Statement of Facts set forth in its application for an Order Confirming Condemnation Authority and for Immediate Possession and adds only the following brief summary.  (See 3:18-1684, Doc. No. 1-4.)  On September 24, 2015, PennEast filed an application with the FERC to construct new pipeline facilities in Pennsylvania and New Jersey.  (See id. at Doc. No. 1,

hereinafter "Verified Compl." at ¶ 12.)  The Project underwent an extensive pre-filing and post-filing review process.  (<u>Id.</u> at ¶ 13.)  The FERC evaluated the public need for the Project (referred to as the "public convenience and necessity" under Section 7(c) of the Natural Gas Act), and completed a thorough review of environmental impacts and operational considerations before issuing the Order authorizing the Project.  (<u>Id.</u>)  The FERC also invited the public to participate in scoping meetings for the Project, and reviewed and considered hundreds of public comments received from interested parties, including federal, state, and local governmental agencies, elected officials, environmental and public interest groups, and potentially affected landowners.  (<u>Id.</u> at ¶ 15.)  The State participated in each step of the process.

As part of the FERC certification process, Rights of Way on over 600 properties were identified as necessary to construct, install, operate, and maintain the pipeline facilities, including properties that are the subject of the State's instant motion (the "Rights of Way").  (<u>See</u> Verified Compl. at ¶¶ 2 (e) and (f), 19; <u>see also</u> 3:18-1684, Doc. No. 1-6, hereinafter "England Decl." at ¶ 8.)  The Rights of Way that FERC approved for the Project included property interests held by the State.  To be sure, the FERC extensively reviewed and approved the Rights of Way prior to issuing its Order.  (Verified Compl. at  ¶ 21.)

### B.      PennEast Receives the FERC Order

Over two years after PennEast started the application process, on January 19,

2018, the FERC issued an Order concluding that there is a need for the Project and

that the Project will serve the public interest (the "FERC Order").  (See 3:18-1684,

Doc. No. 1 at Ex. B, hereinafter "FERC Order".)  Specifically, the FERC

concluded that "[b]ased on the benefits the project will provide to the shippers, the

lack of adverse effects on existing customers, other pipelines and their captive

customers, and effects on landowners and surrounding communities, we find,

consistent with the Certificate Policy Statement and section 7 of the NGA, that the

public convenience and necessity requires approval of PennEast's proposal, subject

to the conditions discussed [in the FERC Order]."  (See FERC Order at ¶ 40.)

Notably, while FERC agreed that "the project will result in some adverse

environmental impacts," as concluded by the FERC in its Environmental Impact

Statements, it found that through the conditions imposed, "these impacts will be

reduced to acceptable levels."  (Id. at ¶ 2.)

### C.      Immediate Access to the Rights of Way is Essential

Access to individual parcels is required for PennEast to survey and collect

information needed to complete its Application to the New Jersey Department of

Environmental Protection ("NJDEP") for the Permit and Certificate and also to

comply with each of the Environmental Conditions of the FERC Order, and to

make the required filings with state agencies and the FERC.  (See England Decl. at

¶ 18.)  For example, the NJDEP has informed PennEast that 100% of the surveys must be completed before the agency will even start its review and render decisions on any permit applications.  (Id. at ¶ 22.)  Access to individual parcels also is necessary to comply with each of the Environmental Conditions of the FERC Order, as well as to make the required filings with state agencies and the FERC.  (Id. at ¶ 18.)  PennEast must complete all filings and submissions identified in the Environmental Conditions of the FERC Order before PennEast can receive authorization to proceed with construction of the pipeline.  (Id. at ¶ 26.)  Time is of the essence because the FERC Order requires that construction be completed and the Project be in service within two years from the date of the Order.  (Id. at ¶ 27.)

Since 2015, PennEast has attempted to engage the State in discussions regarding acquiring the Rights of Way that are subject to Green Acres Program restrictions.  (See 3:18-1684, Doc. No. 22-1, hereinafter "Bucknam Cert.")  These conversations eventually stalled in May of 2017, when the State no longer would engage PennEast in discussions regarding the Project.  (Id. at ¶ 3.)  These protracted negotiations delayed the filing of the instant action and PennEast's ultimate acquisition of the Rights of Way.

### D.   PennEast's Condemnation Actions

In order to stay on track to complete the Project by the deadline set by the FERC, in early-February 2018, PennEast filed Verified Complaints with

6

supporting papers for the condemnation of the Rights of Way required for the Project that PennEast was unable to acquire through negotiations.  (See, e.g., 3:18-1684, Doc. No. 1.)  The State maintains certain property interests in approximately forty parcels being condemned for the Project.  (State Br. at 3.)  PennEast also sought a preliminary injunction for immediate access to the properties to complete the necessary surveys.

Following extensive briefing by the parties, on April 5, 19, and 26, 2018, the Court conducted Show Cause hearings.  These hearings were followed by additional closing argument briefs filed by the parties.  The Court issued a comprehensive 50-page decision denying the State's request for dismissal and granting PennEast's application for Orders of condemnation and for preliminary injunctive relief granting PennEast immediate possession of the Rights of Way in advance of any award of just compensation.  (See 3:18-1684, Doc. Nos. 45, 46.)

On December 31, 2018, PennEast filed a Proposed Form of Order that accurately reduced the Court's December 14, 2018 decision, granting PennEast's application for an order of condemnation and for preliminary injunctive relief allowing immediate possession of the Rights of Way in advance of any award of just compensation, to case-specific Forms of Order for each of the properties in question.  (Id. at Doc No. 50.)

In keeping with its agenda to resist and delay the Project as long as possible, the State filed a lengthy opposition to PennEast's Proposed Form of Order.  (Id. at

Doc. No. 53.)  On January 14, 2019, PennEast filed a detailed response as well as a proposed, revised Form of Order.  (Id. at 59.)  By Order dated January 16, 2019, the Court found that the identification and description of the properties as provided in PennEast's December 31, 2018, proposed Form of Order was sufficient and directed PennEast to file revised case-specific Orders.  (Id. at 61-1.)  On January 22, 2019, PennEast filed the case-specific Orders approved by the Court and on January 25, 2019, the Court entered the Orders.  (See, e.g., Doc. No. 68.)  The Court's Order gave PennEast a substantive right to condemn a permanent Right of Way and temporary easement to be taken on each of the subject properties after posting security in the form of a surety bond.  The security bond was posted on December 20, 2018.  (See, e.g., 3:18-1684, docket entry dated Jan. 28, 2019.)

During the same time, on December 28, 2018, the State filed a Motion for Reconsideration and a corresponding Motion to Stay.  (Id. at Doc Nos. 48, 49.)  On January 8, 2019, PennEast filed briefs in opposition to the State's motions.  In violation of Local Civil Rule L. Civ. R. 7.1(d)(3), the State filed a reply brief in support of its Motion for Reconsideration, although styled as a reply on the Motion to Stay in recognition of the Rule prohibiting replies for consolidation motions. Nonetheless, the Court considered all of the parties' submission and on January 23, 2019, the Court issued an Order denying the State's Motion for Reconsideration and denying the State's Motion to Stay as moot.  (See Doc. No. 67.)  While the State's Motions for Reconsideration and Stay were pending, the State also filed a

Notice of Appeal of the Court's December 14, 2018, decision.  And, on January 25, 2019, the State filed the instant Motion to Stay pending appeal.  Through the filing of the instant Motion to Stay, the State is again clearly trying to delay the orderly progression of the case and set aside the Court's finding that PennEast is entitled to the Rights of Way.

## ARGUMENT

## THE PROPOSED STAY IS UNWARRANTED AND WILL UNNECESSARILY DELAY THE PROJECT.

### A.     The State Is Not Entitled to the Extraordinary Remedy of a Stay.

A stay is an "'***extraordinary remedy***,' to be granted in only ***limited circumstances***." N.L.R.B. v. 710 Long Ridge Road Operating Co. II, LLC, 2014 WL 1155539, at *1 (D.N.J. Mar. 21, 2014) (emphasis added); Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Dep't of Health and Human Servs., 2013 WL 1277419, at *1 (3d Cir. 2013).  Therefore, "the supplicant for a stay must make out a ***clear case of hardship or inequity*** in being required to go forward." Landis v. N. Am. Co., 299 U.S. 248, 255 (1936) (emphasis added);  See also Kobren v. A-1 Limousine Inc., 2016 WL 6594075, at *5 (D.N.J. Nov. 7, 2016) (BRM) ("[A] stay 'is not a matter of right.  It is instead an exercise of judicial discretion, the propriety of which is dependent upon the circumstances of the parties.") (quoting Akishev v. Kapustin, 2014 WL 2608388, at *5 (D.N.J. May 28, 2014)).

Stays are even more sparingly granted when they are requested pending appeal of a preliminary injunction.  See HR Staffing Consultants, LLC v. Butts,

2015 WL 3561618, at *2 (D.N.J. June 4, 2015).  *That is because the standard for obtaining a stay pending appeal is essentially the same as that for obtaining a preliminary injunction*.  See Douglas v. Ashcroft, 374 F.3d 230, 233 (3d Cir. 2004).  The movant seeking a stay bears the burden of demonstrating the following factors:  (1) a strong likelihood of success on the merits; (2) irreparable injury absent a stay; (3) no substantial harm to other parties if the stay is granted; and (4) the public interest is served by the stay.  See Nken v. Holder, 556 U.S. 418, 434 (2009).

A stay pending appeal "should be granted only in *limited circumstances*." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted) (emphasis added).  Stays from preliminary injunction rulings "are *rarely granted*, because . . . the bar is set particularly high."  Conestoga, 2013 WL 1277419, at *1 (emphasis added).  This burden is even higher in these circumstances because, *when a party seeks a stay of a preliminary injunction, the court already has decided the issues necessary for a stay*.  See HR Staffing Consultants, 2015 WL 3561618, at *2 ("*The bar is particularly high where, as here, the movant is seeking immediate relief from a preliminary injunction granted after an evidentiary hearing.  In such a case, the movant is effectively asking the court to negate the preliminary injunction that it just granted.*") (emphasis added).

10

Here, the Court already has analyzed the four factors necessary for a stay and found that, on balance, PennEast should prevail.  Neither the circumstances nor the State's arguments have changed.  Therefore under the same balancing test, the Court should deny the State's Motion to Stay.  The State offers no compelling reason for the Court to grant its application – the State's sole argument is that it disagrees with the Court's ruling on the sovereign immunity issue.  Such argument falls woefully short of the requirements necessary to obtain a stay, and thus PennEast respectfully requests that the Court deny the State's motion.

**B.**     **The State Fails to Meet the Strict Requirements For a Stay Pending Appeal.**

In granting PennEast's Motion for Preliminary Injunction, the Court already has considered the requirements for the State's Motion to Stay and, after extensive briefing and oral argument, ultimately concluded that the balancing test weighs in favor of PennEast.  (See 3:18-1684, Doc. No. 45 at 41-47.)  Further, this Court recently denied the State's Motion for Reconsideration which clearly shows that the Court does not believe that the State is likely to succeed on the merits of its appeal, which was pending when the State filed its Motion for Reconsideration. Because the State cannot meet the standard for a stay, PennEast respectfully requests that the Court deny the State's motion.

11

### 1.      The State Fails to Show Any Likelihood of Success On the Merits.

The State's sole argument regarding its likelihood of success on the merits is that the Court reached the wrong conclusion regarding the State's sovereign immunity.  (See State Br. at 6-10.)  And the sole basis for that argument is that the Court "overlooked" Blatchford.  That is a remarkable position to take given that the Court rejected those exact arguments two days *before* the State filed this motion.  The Court's Order, dated January 23, 2019, specifically states that "[t]he Court thoroughly reviewed and considered the State Defendants' brief and the arguments and cases cited therein, including Blatchford, and therefore did not overlook Blatchford prior to issuing its December 14, 2018 Order and Opinion." (See 3:18-1684, at Doc. No. 67.)  Thus, the State's argument that the Court's December 14, 2018, Opinion was somehow wrongly decided does not support the State's Motion to Stay.

As to whether Blatchford is controlling in this case, the Court correctly distinguished Blatchford as being limited in application to 28 U.S.C. § 1362 and the NGA "is unique and distinguishable from" that statutory provision.  (Id.)  The Court further found that Blatchford did not in any way address the NGA or interstate natural gas pipelines, as the NGA was not even at issue in the Blatchford case.  (Id.)

PennEast's response to the State's "likelihood of success on the merits" argument is set forth at length in PennEast's opposition to the State's Motion for

Reconsideration and is adopted herein.  Therein, PennEast explained why

Blatchford was not controlling.  Briefly, Blatchford involved Native American

villagers bringing a suit for monetary compensation against a State official.  See

Blatchford, 501 U.S. at 777-78.  The Native American tribe relied on 28 U.S.C. §

1362 to argue that sovereign immunity did not apply to any Native American tribe

or villagers.  Id. at 782-83.  Section 1362 provides:

> "The District court shall have original jurisdiction of all
> civil actions, brought by any Indian tribe or band with a
> governing body duly recognized by the Secretary of the
> Interior, wherein the matter in controversy arises under
> the constitution laws or treaties of the United States."

Id. at 783 (quoting 28 U.S.C. § 1362).  The Supreme Court rightly observed, and

this Court agreed, that Section 1362 is a jurisdictional statute that allows Native

Americans to bring suit in the federal courts, but does not confer any substantive

rights.  Id. at 783-84.  Section 1362 was not intended to define what types of suits

could be brought by Native American tribes.  Id.  By contrast, the NGA does

confer a substantive right, the federal power of eminent domain, upon an

authorized interstate natural gas company following issuance of a FERC Order.

That is very different than a statute that simply provides for where a claim may be

brought.  Indeed, the NGA is not a purely jurisdictional statute in that it allows

claims to be brought either in federal court or state court.

The only other case that the State cites in its moving brief, Sabine Line v. A

Permanent Easement of 4.25 Acres of Land in Orange County, Tex., 327 F.R.D.

116, 139-41 (E.D. Tex. 2017)[3], also is readily distinguishable.  (State Br. at 8-9.)
The <u>Sabine</u> case is not binding, did not address any of the arguments raised by
PennEast here and presented a starkly different factual scenario than that which is
presented to this Court.  <u>Sabine</u> involved a pipeline that had been approved by the
FERC's predecessor in 1964.  <u>See</u> 327 F.R.D. at 135.  This timing is significant
because, at the time of the pipeline's approval, the property at issue was privately
owned.  <u>Id.</u>  Thus, in 1966 the pipeline company negotiated a right of way
agreement with the private landowner that eventually expired in
2016.  <u>Id.</u>  Sometime during the time that the agreement was in place, the private
landowner transferred one impacted parcel to the Texas Parks and Wildlife
Department ("TPWD"), which refused to renew the right of way access agreement
so that the pipeline company could retain its rights to the tract that the Sabine
pipeline traversed.  <u>Id.</u>  The pipeline company was unable to reach an access
agreement with TPWD.  <u>Id.</u>

      The facts before this Court could not be more different.  Here, the FERC
issued PennEast a certificate order authorizing a new pipeline route knowing full
well that the pipeline route would traverse state-interested parcels.  (<u>See</u> FERC
Order at ¶ 158) ("There are no changes expected in the conservation status of
public lands crossed by the project, including state game lands and state highways
and maintenance areas.").  Thus, this situation is distinguishable from <u>Sabine</u>,

---

[3] Oddly, the State does ***not*** state that the Court overlooked <u>Sabine</u>, even though it
was decided prior to the Court's ruling.

where the State refused to enter into a Right of Way access agreement concerning a pre-existing pipeline, and where the FERC's predecessor never contemplated the impact to lands owned by a state entity as the FERC did here.  Further, it is clear that the Sabine court did not consider any of the arguments made by PennEast here, particularly with regard to Federal Power Act and the Amtrak statute.  Nowhere in Sabine does the court consider that Congress has passed similar statutes vesting private entities with condemnation authority, but specifically limited actions against States, while Congress chose not to do so in the NGA.

In sum, the State is grasping at straws by arguing that Blatchford was overlooked by the Court, especially since this Court already has clearly articulated that it did not overlook that case.  Therefore, this Motion to Stay is simply another attempt by the State to delay the Project and assert State-control over the regulation of interstate natural gas pipelines.

## 2.   **Denying the Stay Will Not Cause Irreparable Harm to the State.**

To show irreparable harm, the movant must "demonstrate that irreparable injury is likely [not merely possible] in the absence of [a] [stay]."  In re Revel AC, Inc., 802 F.3d 558, 569 (3d Cir. 2015) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)).  Here, the State fails to identify any actual harm that will befall the State if the Court denies the State's requested stay. Instead, the State asserts that, as long as this Court's decision regarding the

15

inapplicability of Eleventh Amendment immunity remains in effect, the State's sovereignty is being "undermine[d]" which allegedly constitutes irreparable harm. (State Br. at 11-12.)  The State makes this bold assertion without a single supporting case.  This argument places the cart before the horse because it presumes the deprivation of a constitutional right – which is a contested issue. This is just a rehashing of the State's argument that the Court wrongly decided the sovereign immunity issue.  Beyond being simply incorrect, the State's disagreement with the Court is not a basis for granting a stay.

There is no harm to the State.  The Court's December 14, 2018, Opinion was limited to situations where a natural gas pipeline company has been vested with the federal power of eminent domain through a FERC Certificate.  The Court's Order does nothing to affect the application of the Eleventh Amendment in any other situation.  Thus, the Court's ruling actually is quite narrow.  Further, for decades, the State has never argued that the holder of a FERC Certificate is barred from acquiring land in which the State holds an interest and indeed has consented to a number of natural gas pipelines running through state-protected land.  It is difficult to reconcile the State's current position with its necessary corollary – that for decades the State consented to alleged irreparable harm by allowing natural gas pipelines and other utilities to traverse environmentally protected lands.

The State also asserts that absent a stay, the State's "long-standing open space and farmland preservation programs will also be unnecessarily and

irreparably injured." (State Br. at 12-13.) However, the State does not actually explain how the programs would be injured. Irreparable harm cannot be based on vague, conclusory allegations. See Anderson v. Davila, 125 F.3d 148, 163–64 (3d Cir. 1997) (stating relief is inappropriate where movant cannot show harm is ongoing or that there is a real or immediate threat of harm). The State spends several pages discussing the history and purpose of its various land conservation programs. (See State Br. at 13-16.) But, the State fails to assert any specific harm that would occur without a stay. Rather, the State seems to claim that any encroachment on preserved land will cause irreparable harm. That position is directly contradicted by the State's regulations, past conduct in other pipeline cases, and the activities of the State related to the Project.

The two main environmental restrictions at issue here both specifically provide for how condemnation is to be handled and both provide that money damages are sufficient to compensate the loss of such environmental restrictions. See N.J.A.C. 7:36–26.1; N.J.S.A. 4:1C-19. As to property subject to New Jersey's Green Acres Program requirements, there is a specific established "diversion" process, wherein the State considers the appraised value of the property and accepts either a land exchange or monetary compensation for the acquisition of Green Acres Program restricted property. See N.J.A.C. 7:36–26. As to SADC, the State long has recognized that SADC properties can be condemned. Indeed, the SADC easements have a standard "Paragraph 23" which provides for the division

of proceeds in a condemnation provision.  Further, the SADC guidance specifically

recognizes that SADC properties are subject to condemnation by natural gas

pipeline companies vested with the federal power of eminent domain by virtue of a

FERC Certificate.  See Landowner Guide To SADC Procedures for the

Condemnation of Preserved Farmland, available at

https://www.nj.gov/agriculture/sadc/news/hottopics/Condemnation%20Procedural

%20Guidelines%20for%20SADC%20Website%20FINAL%2007072015.pdf.

Thus, the State should not be permitted to contradict itself and claim that, after

decades of taking monetary payments for acquisition of land that is subject to

environmental, farming, recreation or open space preservation restrictions, now

argue that somehow money cannot compensate these interests.

Lastly, the State vaguely claims that the condemnation of the State's

property interests will somehow change the character of the land and thereby

frustrate the purpose of the State's preservation programs.  (State Br. at 16.)

However, the FERC already considered the impact to State property interests when

it issued the Certificate for the PennEast Pipeline Project.  (See FERC Order at ¶

158 ("There are no changes expected in the conservation status of public lands

crossed by the project, including state game lands and state highways and

maintenance areas.").)  *For example, following discussions with the State, of the*

*Green Acres-encumbered parcels, the route will be collocated with existing*

*utilities for 85% of the route to minimize visual and environmental impacts.*  See

18

PennEast Final Environmental Impact Statement at 4-169, <u>available at</u>

https://www.ferc.gov/industries/gas/enviro/eis/2017/04-07-17-FEIS.asp[4].  Thus, it

is difficult to see how these easements will have much, if any, impact on State

preserved lands.  In sum, the State has not sustained its burden of showing that it

will suffer irreparable harm during the pendency of its appeal.

### 3.     <u>Granting a Stay Will Cause Significant Harm to PennEast.</u>

The State claims that PennEast will not be harmed by a stay because the

FERC Order's deadline for completion of the Project's construction could be

moved and any contractual obligations PennEast has relating to the Project are

self-imposed deadlines.  (State Br. at 16-18.)  These are the same "chicken and

egg" arguments that the State previously made, which were rejected by the Court.

(<u>See</u> 3:18-1684, Doc. No. 45 at 42-43.)

Even with round two of the State's application for a stay, the State still has

not rebutted PennEast's case law finding irreparable harm to a pipeline company

where construction delays caused FERC-mandated in-service deadlines to be

missed.  <u>See, e.g.</u>, <u>Tennessee Gas Pipeline Co. v. 0.018 Acres of Land in the Twp.</u>

<u>of Vernon, Sussex County, N.J.</u>, 2010 WL 3883260, at *2-3 (D.N.J. Sept. 28,

2010); <u>see also</u> <u>Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less in</u>

<u>Penn Tp., York County, Pa.</u>, 768 F.3d 300, 315-16 (3d Cir. 2014) (finding that an

interstate natural gas company would likely suffer irreparable harm by a delay in

---

[4] The Court may take judicial notice of the PennEast Final Environmental Impact
Statement pursuant to Fed. R. Evid. 201.

the completion of a natural gas pipeline project); <u>Transcontinental Gas Pipeline Co., LLC v. 2.59 Acres of Land in Pine Grove Twp., Schuylkill County, Pa.</u>, 2017 WL 4005011 at *3 (3d Cir. Sept. 12, 2017) (recognizing irreparable harm for pipeline construction delay causing contract breach).

Immediate access to individual parcels along the corridor of the Project is required in order for PennEast to survey and collect information needed to complete its application to the NJDEP for a Permit and Certificate.  (<u>See</u> England Decl. at ¶ 18.)  The NJDEP has informed PennEast that 100% percent of the surveys must be completed before the agency will even start its review and render decisions on the Permit and Certificate Application.  (<u>Id.</u> at ¶ 22.)  Access to individual parcels also is  necessary to comply with each of the numerous Environmental Conditions of the FERC Order.  (<u>Id.</u> at ¶ 18.)  Thus, it is critically necessary for PennEast to obtain immediate access to the Rights of Way in order to meet stringent deadlines for on-site survey activities – which, in turn, must be completed on an expedited basis to satisfy the FERC Order, obtain necessary approvals, and meet the FERC in-service deadline.  (<u>See id.</u> at ¶¶ 10-11, 17-30.)

**4.      <u>Granting a Stay Would Severely Harm the Public Interest.</u>**

Staying the PennEast Pipeline Project would actually harm the public's interest given that the FERC has already found that the Project serves the public interest.  The State's only argument regarding this issue is that the public interest in preserving lands for recreation, conservation, and agriculture favors a stay.  (State

Br. at 18.)  As discussed above, the stay is unnecessary to preserve the character of the lands in question.  After extensive evaluation, including reviewing material submitted by the State, the FERC issued its Order specifically finding that there are no changes expected in the conservation status of public lands crossed by the Project.  (See FERC Order at ¶ 158.)

The State also does not attempt to counter the Court's finding that the FERC made a determination that the Project is necessary and in the public interest.  (See id. at ¶ 40 ("the public convenience and necessity requires approval of PennEast's proposal.").)  As the Court correctly stated, this conclusion concerning the public interest was reached after an extensive administrative process that weighed the harm to the public against the need for the Project.  (See 3:18-1684, Doc. No. 45 at 47.)  Thus, the only clear public interest concerns the importance in completing the Project.

## CONCLUSION

For all of the foregoing reasons, PennEast respectfully requests that the Court deny the State's Motion to Stay.

|  | Respectfully Submitted, |
|---|---|
|  | Archer & Greiner, P.C. |
|  | Attorneys for PennEast Pipeline |
|  | Company, LLC |

Dated:  February 5, 2019                *s/ James M. Graziano*
                                        JAMES M. GRAZIANO

215910348v1

21